## Elsie Annen, Appellee, v. W. F. McLaughlin and Company, Appellant.

### Gen. No. 19,938.

1. INSTRUCTIONS, § 20*—*propriety of referring jury to declaration.* Instructions which state, in substance, that plaintiff may recover if she has made out her case as charged in the declaration or in some or more counts thereof, though not commendable, are not erroneous unless the declaration has omitted reference to some substantial defense which is made.

2. MASTER AND SERVANT, § 784*—*when instructions not erroneous as ignoring defenses.* In an action by an employee for personal

*See **Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly,** same topic and section number.

Annen v. W. F. McLaughlin & Co., 189 Ill. App. 261.

injuries, instructions given for plaintiff *held* not erroneous, for the reason that they ignored the defenses arising from the rules concerning assumed risk, fellow-servants and proximate cause, it appearing that the defense of assumed risk was not applicable to the case and that an instruction was given stating that the plaintiff must make out the case charged in the declaration which stated that the negligence was not that of a fellow-servant and alleged that the cause of the injury was the negligence of defendant.

3. MASTER AND SERVANT, § 508*—*when employee not guilty of contributory negligence in falling down elevator shaft.* In an action by an employee for personal injuries received by falling down an open elevator shaft alleged to have been caused by the negligence of defendant's elevator man leaving the elevator door open in a room which was dimly lighted, *held* that a verdict for plaintiff was not against the weight of the evidence for the reason that it showed plaintiff guilty of contributory negligence.

4. MASTER AND SERVANT, § 111*—*when leaving elevator door open proximate cause of injury.* In an action by an employee of defendant for personal injuries received by falling down an elevator shaft, where it was alleged that defendant's elevator man was negligent in leaving the elevator door open when the elevator was at a floor above, *held* under the defendant's theory of the case that the accident happened while another employee was scuffling with plaintiff and that plaintiff fell down the shaft while struggling to free herself, that the defense of contributory negligence was eliminated, and that a verdict for plaintiff could be sustained on the theory that the negligence of defendant was one of the proximate causes of the injury.

5. NEGLIGENCE, § 53*—*proximate cause.* Where an accident is the result of the concurrent negligence of two persons, without the negligence of both of which it would not have occurred, the negligence of each is a proximate cause, and each is liable.

McSURELY, J., dissenting.

Appeal from the Superior Court of Cook county; the Hon. HUGO PAM, Judge, presiding. Heard in this court at the October term, 1913. Affirmed. Opinion filed October 13, 1914.

HOLT, CUTTING & SIDLEY, for appellant.

DARROW & BAILY, for appellee.

MR. PRESIDING JUSTICE BROWN delivered the opinion of the court.

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

The distressing occurrence from which this litigation arose happened August 10, 1910. The plaintiff and a man named Shiretski fell together through an elevator shaft from the third floor to the basement of the building of the defendant corporation, of which they were both employees. Shiretski was instantly killed, the plaintiff was severely injured and was carried to a hospital where she remained several weeks. From there as soon as she could be moved she was taken to testify at an inquest over Shiretski, and from thence home. She was permanently but not entirely crippled. This suit was begun in the Superior Court of Cook county February 24, 1911, and has been twice tried. At the first trial in December, 1912, the jury disagreed. At the second in April, 1913, the jury returned a verdict for the plaintiff for seventy-five hundred dollars. The plaintiff remitted to six thousand dollars and a motion for a new trial and a motion in arrest of judgment made by the defendant having been overruled, judgment was entered upon the verdict.

The attribution by plaintiff of liability to the defendant corporation is based on allegations in those counts of the declaration which went to the jury—that she was employed at the time of the accident by the defendant and that it was its duty to furnish her a safe place to work; that there was a freight elevator used between the floors of the defendant's building; that on the day of the accident the elevator door from the third floor, on which she was working, into the elevator and inclosed shaft was left open, and that the room through which the elevator ran was not sufficiently lighted so that she could not "in passing about said room in the exercise of ordinary care see that the door in said elevator shaft was open," by reason of which, while in the exercise of ordinary care, she was going from one part of the third floor to another, she fell into said shaft and was injured.

The first of the three counts submitted to the jury declared the negligence to be not furnishing sufficient natural light, the windows being ''negligently permitted to be covered with dirt, smoke and dust''; the second asserted the negligence to be the absence of artificial light alleged to have been necessary; while the third avers it to be the leaving open by a servant of the defendant, but not a fellow-servant (in legal parlance) of the plaintiff, of the existing elevator door on the third floor while the elevator was above that floor.

It is on the third count which went to the jury—the fourth of the declaration as filed—averring negligence in leaving the door in question open, that the plaintiff chiefly bases her assertion of right of recovery, although the alleged semiobscurity of the room and shaft is, it is argued, to be considered with reference to the defense made of contributory negligence on the part of the plaintiff.

We think there can be no doubt of the negligence of a servant of the defendant in leaving the door of the elevator open either when he left it to go to another room, or, as he says, after returning from that room and finding that while he was away the elevator had been hauled up from above.

While actual darkness in the room was not proven, we think there was evidence from which the jury could fairly infer that there was a greater or less murkiness and obscurity existing from the conditions which made it peculiarly wrong and dangerous to leave open and unguarded there an elevator shaft which was usually closed except when the elevator was on the floor. It would have been dangerous to employees who had to work there even if the light had been perfect.

Nor do we think that there is any evidence in this case tending to show that in the sense that the term is used in the law of this State, the elevator operator was a fellow-servant of the plaintiff, or that the doctrine of ''Assumption of Risk'' is in any way involved,

or that if the defendant is liable the damages even before the remittitur can be considered excessive. By eliminating these matters at the outset we can more quickly come to the questions really involved in the litigation, especially as doing so also removes, we think, from the case before us any serious question as to the instructions under which it went to the jury.

The complaint is made of three of the instructions, which, in substance, state if the plaintiff has made out her case as charged in her declaration or in some one or more counts thereof, she may recover. Such instructions are hardly commendable because vague and indefinite and practically useless in guiding a jury to the consideration of the real issues involved; but they are not erroneous unless the declaration has omitted reference to some substantial defense which is made. *Illinois Terra Cotta Lumber Co. v. Hanley*, 214 Ill. 243.

In the case at bar the position of the appellant is that the giving of the instructions ignored the defenses arising from the rules concerning (a) Assumed Risk, (b) Fellow-Servants, (c) Proximate Cause.

As we have said, we do not think there is any basis in the conceded circumstances of this case for the defense of assumed risk; and the fourth count of the declaration (the third of those submitted to the jury) avers that, "the servant of the defendant who left said elevator door open as aforesaid and plaintiff were not fellow-servants," thus making it one of the averments of the declaration to which the jury were referred.

It also says that it was "by reason of the negligence of the defendant in causing the elevator door to be left open" that the plaintiff fell into the elevator shaft.

The declaration therefore also raises the question of proximate cause.

We are thus brought to the gist of the controversy.

The statements of the facts of the accident on behalf of the plaintiff and on behalf of the defendant are di-

verse, and there is evidence in the record to sustain each. There are, moreover, differing defenses which it is insisted by the defendant are sufficient, whichever version of the accident may be accepted by us, or may have been presumed to have been accepted by the jury. It will be, therefore, well to treat of these versions separately.

The plaintiff's version is supported by her own testimony, and, as we shall point out when discussing the alternative version, to a limited extent, we think, by another witness.

It is that on the day in question she was employed, as she had been for the greater part of a year before, in weighing and packing coffee in small packages, cans or cartons in the room in the McLaughlin building next east of the blending room in which the elevator door was so unfortunately left open. She was about twenty-two years old. The weighing and packing were done by machinery, and on this particular day she was temporarily forewoman in charge of several girls who were working in the packing room. She needed cans and called one Paul Menninger, a general utility errand boy, and told him to go upstairs and get some cans. Paul left, went into the blending room and upstairs. Then the bell of a telephone attached to a post near the opening between the packing and blending room rang. The plaintiff left her work and answered the telephone call. Then thinking that Paul was not quick enough in bringing the cans, she stepped into the blending room, as she did so calling, ''Oh, Paul!'' but receiving no answer. The door to the elevator shaft was open. The elevator shaft was west of the center of the room, was about seven feet square, and on this floor was entirely enclosed when the door was shut. The door was a sliding door which opened by being shoved to the west, and in the natural and proper order of things was only opened when the elevator was on that floor to unload or take on freight. The plat-

Annen v. W. F. McLaughlin & Co., 189 Ill. App. 261.

form of the elevator was not inclosed, but consisted of a platform hung on chains or ropes that worked up and down the elevator shaft and were operated from the inside of the elevator by an elevator man. The platform was made of old wooden planks dirty from use. The plaintiff seeing the door open and knowing that it ought not to be open except when the elevator was standing at the floor, believed the elevator was there. She was hurried, she says, ''in order to keep the girls going,'' and without speaking to anyone else she went to the door of the elevator shaft, took hold of the post of the shaft and called out, ''Oh, Paul, are you coming down sometime today with those cans?'' As she did it, she was looking up the elevator shaft, supposing Paul was gathering the cans or package holders near the shaft on the next floor to bring them down by the elevator. She had placed one hand on the post of the elevator shaft and had one foot ready to step into the elevator. She heard Shiretski shout, ''Look out, Elsie, you will fall,'' and remembered no more. She had fallen and with her had fallen Shiretski.

Shiretski was the only regular occupant of the blending room. He blended the coffee, and the work in the blending room had nothing to do with the work in the packing room and the plaintiff had no labor in connection with Shiretski. Shiretski's desk was in the blending room not far from the elevator shaft. The plaintiff testified that she did not remember seeing him come into the packing room with a cup of coffee for one of the other girls—a Miss Miller—as she was at the telephone or leaving it, but that she might have done so. She knew he was in the habit of bringing coffee to Miss Miller every morning. Miss Miller testified that he brought her coffee just as the plaintiff went to answer the telephone, and went immediately back, whether preceding or following the plaintiff she does not know. The plaintiff also testified

that she spoke to no one on the way from the telephone to the elevator shaft, and saw neither a man named McGuire nor a boy named Dale, whose testimony will be hereafter mentioned.

The defendant maintains that if this story of the plaintiff is taken as true and accurate, it shows on its face contributory negligence on the part of the plaintiff which must bar her recovery. It is said there could be "no excuse for such heedless and reckless inattention to her surroundings and disregard for her own safety" as this story shows, and that on it the jury should have been peremptorily instructed for the defendant, on the ground on which the jury was so instructed, for example, in *Browne v. Siegel, Cooper & Co.,* 191 Ill. 226, namely, that no reasonable minds could disagree on the subject of the plaintiff's contributory negligence. After repeated and careful study of the testimony, the majority of the court are unable to assent to this conclusion.

We think that the character of the room and the elevator and its surroundings and use, and particularly that the plaintiff, in the absence of any evidence to the contrary, must be presumed to have always seen the elevator door closed except when the elevator was at the floor, and that she was in her haste zealously and diligently attending to her employer's business, distinguish the case at bar from *Browne v. Siegel, Cooper & Co., supra,* and other like cases. It cannot, we think, be justifiably said that no reasonable minds could come to any conclusion but that her action as narrated by herself was negligent and careless. If it cannot, then the defense of contributory negligence was a question for the jury and has been negatived by them on the assumption that they believed her story. The jury were properly and fully instructed on the subject. They were told that if they believed from the evidence that the plaintiff at and before the time of the happening of the accident complained of failed to ex-

ercise reasonable care and that such failure contributed however slightly to bring about the accident, the plaintiff could not recover.

But the defendant with even more insistence contends that this story of the plaintiff is not to be accepted as true; not only, it says, is it inconsistent with a right to recover if true, but it is overborne by the manifest weight of the evidence in favor of an entirely different version of what happened before the fall. On the assumption that the jury believed it, then it is argued that even if we should differ from defendant's counsel's position that it furnished ground for a peremptory instruction, we ought to set aside the verdict as against the evidence.

On the contrary assumption that the jury did not believe it, but gave credence to the defendant's version, it is urged again that there is no warrant for the verdict, which should then have been for the defendant as a matter of law.

The defendant's version of the occurrence rests mainly on the testimony of a superintendent of the roasting department of the defendant's coffee business, named McGuire, who has been in the employ of McLaughlin & Company for twenty-six years. He testified that on the morning in question he left his department on the fourth floor and came down a stairway leading to the blending room on the third floor. As he was coming down the stairway he saw the plaintiff coming through the passageway from the packing room to the blending room pushing a crate in front of her with her knees and her hands. There was a door at the foot of the stairs going up only part way to the ceiling, however, and he spoke over the top of it to her, making some joking remark about its being a soft job for her, to which she made a like joking reply. She kept pushing the crate over to the door of the elevator and McGuire opened the door and came out into the room. While the plaintiff shoved the

crate over to the elevator shaft, McGuire went to
speak with Shiretski. Shiretski rose from his desk
and he and McGuire went together to a point about
ten feet away from the elevator and stood talking.
At that time, McGuire says, the plaintiff was calling
up the elevator shaft for Paul, but she came back to
where he and Shiretski were talking and Shiretski
said to her, apparently joking, "You talk too much"
or "You have too much to say. I will throw you down
that hatch," with some other "kidding" remarks
about her being the forewoman that day. The plain-
tiff said, "You aint big enough to throw me down."
At that Shiretski put his arms around her in front,
she scuffled a little "to wiggle out of that hold," he
carried her to the hatchway, she calling out, "Quit
Joe; quit Joe," and they both went down the shaft
together. This story is corroborated by Dale, the ele-
vator boy who left the door open. He says he had
run the elevator to the third floor and left it there
with the door into the shaft open to go to the roasting
room to get a drink; that when he came back he found
the door closed; that he opened it and found the ele-
vator gone, but left the door open; that he stood by
the side of the elevator three or four minutes; that
he noticed the plaintiff, Shiretski and McGuire ten or
twelve feet south of the elevator "joking and talking
and laughing"; that all at once Shiretski said, "Look
out! I will throw you down the hatch"; that he
started carrying the plaintiff towards the hatch, "and
then they just fell over." "He just took her over to-
wards the hatch and they fell overboard"; that Shiret-
ski's manner in taking her to the hatch was playful;
that the plaintiff did not stand close enough to the ele-
vator shaft to look up in it, nor did she the instant be-
fore she fell call up, "Oh Paul," nor did he reply, "I
am coming."

The story of Paul Menninger, the boy whom the
plaintiff sent to the fourth floor for the cans, is some-

what different. He says that after he had brought a crate of cans to the elevator shaft on the fourth floor he found the elevator was at the fifth floor; that on the fourth floor there were gates about four feet high to close the elevator shaft; that he stood by one of them and the plaintiff called to him from the third floor, saying also, "Are you coming with those cans?"; that he looked down and saw her head and arm and answered, "Yes, I will be down in a minute when I get the elevator"; that the plaintiff then drew away so that he could not see her; that during the next minute or two he heard the voices of the plaintiff and two men on the floor below. "Besides the talking," he says, "I heard joking and laughing. I could not tell what was being said. The next thing that happened there was, I heard somebody say 'Look out, you will fall.' Then I looked down and I saw something falling in the shaft. At the same time when I heard the words 'Look out, you will fall' I heard shuffling, that was the same time, not after and not before."

The theory of counsel for the plaintiff is that Shiretski, after carrying the coffee to Miss Miller, followed the plaintiff into the blending room; that the plaintiff stepped to the elevator to see if Paul was at the elevator on the floor above, and undertook to take a step onto the elevator platform, that she might be in a position to look up; that just as she was about to take that step Shiretski came from the packing room into the blending room, saw her, exclaimed, "Look out, you'll fall," grabbed for her from behind and in his effort to save her overbalanced himself and went down with her.

We are under no obligation to say which of the three stories of this accident—for there are really in the testimony we have recited three stories irreconcilable in some respects—we ourselves think the most reasonable or probable, if no one of them is impossible

or inherently so improbable as to be unworthy of belief. The jury had under consideration not only the stories themselves, but the personality and manner of the witnesses as they were examined, and the majority of the court are not prepared to say that if to support the verdict it must be assumed that the jury believed the plaintiff's story of the accident and disbelieved McGuire's, we should be justified in setting that verdict aside. We think that taking all the evidence together it cannot be said that there is a clear and manifest preponderance against the plaintiff's version, or that it is so inherently improbable that reasonable men cannot accept it.

But the majority of the court are also of the opinion that it is not essential to the support of the verdict to assume that the jury disbelieved McGuire's story. That story eliminates the defense of contributory negligence. In the story that McGuire told there was nothing that showed negligence on the part of the plaintiff, no voluntary participation in the "romping" or "larking" of Shiretski which cost so dear. She called on him to stop; she struggled to free herself. Shiretski's action was careless to the last degree, but that cannot be imputed to the plaintiff nor, under the circumstances of this case, can there be any question of "fellow-servants" as relating plaintiff to Shiretski's negligence. No influence either by "direct co-operation" or "usual association" over Shiretski affecting this carelessness could be predicated, even had their usual duties brought them more in contact than they did.

The sole question, therefore, remaining in the cause on the assumption that McGuire's story was accepted by the jury is that of "proximate cause." It is not, we think, a simple or an easy one. The defendant's view is well expressed in the argument of its counsel thus:

"It is conceded that the elevator door was open,

but the open door was in no manner the cause of the plaintiff's injuries. The cause was the foolish and foolhardy action of Joe (Shiretski). The open door was but a condition—a necessary one, it is true—but still merely a condition and not a cause."

The court, however, instructed the jury quite as favorably in this regard as the defendant had the right to demand, by telling them that, "if an act on the part of one Shiretski intervened between the time when the door was left open and the plaintiff's injury, and that such act was the *immediate* cause of the accident, and was of such a nature that no reasonable person would anticipate such conduct on Shiretski's part, then the plaintiff cannot recover."

It seems to the majority of the court that the leaving open of the elevator shaft in this dimly-lighted room, among the employees whose duties required them from time to time to communicate and to pass between the floors, was something more than a condition which allowed a third party's negligence to be injurious. It was rather, under the circumstances of this case, if McGuire's story is true, one proximate cause of the injury of which the concurrent carelessness of Shiretski was another. If the accident was the result of the concurrent negligence of two persons, without the negligence of both of which it would not have occurred, the negligence of each is a proximate cause, and each is liable. *Wabash, St. L. & P. Ry. Co. v. Shacklet*, 105 Ill. 364; *Pullman Palace Car Co. v. Laack*, 143 Ill. 242.

The judgment of the Superior Court is affirmed.

*Affirmed.*

MR. JUSTICE McSURELY dissents.