John E. Lotspiech, Appellee, v. Continental Illinois National Bank and Trust Company of Chicago et al., Appellants.

Gen. No. 42,094.

Heard in the third division of this court for the first district at the December term, 1941. Opinion filed December 9, 1942.

ECKERT & PETERSON, of Chicago, for appellants; A. R. PETERSON, OWEN RALL and JOHN B. PHILLIPS, all of Chicago, of counsel.

RYAN, SINNOTT & MILLER and CLARENCE F. MARTIN, all of Chicago, for appellee.

MR. PRESIDING JUSTICE BURKE delivered the opinion of the court.

In a trial in the circuit court of Cook county, John E. Lotspiech, a physician, was awarded a verdict of $25,835 against the Continental Illinois National Bank and Trust Company, a national banking association, Marshall Field and George Richardson for personal injuries suffered by him in an office building owned by the defendants. Motions for a judgment notwithstanding the verdict and in the alternative for a new trial were overruled. Judgment was entered on the verdict, to reverse which this appeal is prosecuted.

Plaintiff was licensed to practice medicine in 1927. He became a subtenant of another physician in the five-story office building at the northwest corner of South Shore Drive and 71st street, Chicago, in 1930, and remained such after the defendants became the owners and operators of the building in 1936. Plaintiff's office was on the third floor. The building was

largely tenanted by doctors and dentists, many of whom found it necessary to visit their offices after regular hours. A passenger elevator was in operation in the building on week days until 10 or 10:30 p. m. This elevator was not in service on Sundays. The front door was locked on Sundays. The building has a lobby entrance to the south. A drug store occupies the first floor corner east of the entrance to the lobby, but there is no doorway from the lobby to the drug store. The outer entrance of the lobby consists of two swinging glass doors with glass transom above and glass panels at each side of the doors and transom. The inside doors have glass panels on the side. The inner doors are 6 feet inside of the outer doors. The lobby is a rectangle 10½ feet wide, extending north about 24 feet from the inner doors to the elevator, the stairway being to the left of the elevator. On the east wall of the lobby, on the right side as one goes in, is a directory protruding slightly from the wall. Here it was customary to keep the rod or key with which to open the door of the elevator when it was closed and when no one was in the car to open it. The stairway to the left of the elevator led upward to all floors. The lights in the lobby were controlled by a key switch in a recess on the west side of the lobby wall near the stairway, and after hours the lights were turned off. We agree with the statement of plaintiff that it was obviously impracticable to furnish offices for doctors and dentists without providing them with some means of using their offices whenever an emergency might arise. To meet this situation a custom had grown up of furnishing keys for the building to all the occupants. The plaintiff was given one of the keys and used it to open the front door the evening of the accident. The evidence shows that the custom had also grown up, acquiesced in by the defendants, whereby the tenants were permitted to operate the elevator for themselves during periods

when the operator was not on duty. As an interne, plaintiff learned to run an elevator. While no regular service was maintained in the building by defendants on Sundays, the engineer in charge who resided in the building, was in the habit of walking around the building and checking up on it once in a while. It was customary for the tenants to run the elevator after hours at night and on Sundays when the management did not furnish service. Plaintiff knew this, and defendants' engineer Taylor, now deceased, and other employees knew it. On Sunday, March 13, 1938 plaintiff drove Mervin La Rue, a friend and patient, to his office in defendants' building for the purpose of treating him. They arrived at the building about 6:45 p. m. It was a cold, dark night. Plaintiff, using his key to the outer door to admit himself, told La Rue to wait inside the doorway, and went to get the rod or key for the elevator from the directory. Plaintiff knew the lobby of the building was dark and that no elevator operator would be on duty. He also knew that no employees of the building were there at the time. The lobby was dark, except for such light as came from the street lights outside. There were a number of switches on a panel in the wall. These switches, however, were all locked with a key and could only be operated by employees. The light over the first floor stair landing was also controlled by these switches and was out on this occasion. There was a 60 watt light at the top of the stairway on the second floor. Owing to a turn in the stairs this light was of no avail on the ground floor. The walls on either side of the lobby were solid, except for a door at the left rear, near the stairway. This door led to a store which was not open on the evening in question and no light came through it. The lobby was in total darkness. Access to the lobby from the street was gained through two sets of doors, flanked by glass panels. The doors were composed of heavy frames, inclosing panes of glass.

A street light was placed slightly to the west of the entrance to the building. Apparently, this light was not turned on at the time of the accident. There was an electric light in the elevator which plaintiff intended to turn on. In a little grip, such as is carried by physicians, plaintiff had a flashlight, called a throat light. This was not used until after plaintiff suffered his unfortunate fall. Plaintiff did not know when he entered the building, whether the throat light was in his bag. Plaintiff proceeded without throat light or matches to the building directory, where he got the key or rod, and then went toward the elevator with bag and rod in hand. He set the bag down before he came to the elevator door and put his hand out to feel the elevator door. He did not feel the elevator door where he expected it to be. He then took a step forward, hit his foot, struck something and was precipitated into the elevator shaft through the door which had been left open. Mr. La Rue, the patient, who had become restless at the delay, called for the plaintiff and not getting a reply, went into the lobby to look for him. He heard a voice, lit some matches and saw that the elevator door was propped open by a sand container, or urn, and that the plaintiff was at the bottom of the shaft. Plaintiff directed the patient to look into his bag to see if he could find a small flashlight which was sometimes carried there. The patient took the bag out to the vestibule, where there was light enough to see, dumped the contents out, and found the flashlight and with assistance removed the plaintiff. The door of the elevator was self-closing, so that it would have closed itself had it not been propped open by the sand jar. The elevator was so constructed that when the door was open the car could not be moved until an emergency switch was used. The usual procedure followed by tenants when they operated the elevator themselves, was to take the key off the directory, open the elevator door, return the key to its position over

the directory, then step into the elevator, shut the door and start the car. The elevator door would remain open when the elevator was at the floor level if pushed completely back. The elevator door in the lobby closed automatically when the car started. If the door was prevented from closing, the car could not be moved away from the floor unless an emergency switch was used. A subtenant named Baker, an X-ray technician with offices on the fourth floor, was in the building at the time of the accident and for some time previously. Baker worked doing some carpenter work in his office on the afternoon preceding the accident, and after going home for a tool around 4:30 or 5:00 o'clock, took the elevator up to the fourth floor, where it was stationed when the plaintiff fell down the shaft. Baker testified that he closed the elevator door when he took the elevator from the first floor. He started down with the elevator after the accident, but stopped when La Rue shouted. Two doctors who likewise were tenants in the building testified that at no time did they have difficulty in finding their way about the lobby, or in seeing the elevator door when the lights were off. Plaintiff's office was on the third floor. As to who left the door of the elevator open, the record is barren of evidence or inference. The plaintiff suffered at least five fractured ribs, one of which punctured his lung, and he was kept in an oxygen tent. He had three nurses whose bills aggregated $387. His hospital bills were $860.30. His left humerus was so severely fractured that Dr. Magnuson performed a complicated operation on it, a reasonable charge for which would be $1,000. He testified that he lost at least $2,000 in income in 1938 and $2,500 in 1939. Defendants do not contend that the damages are excessive.

Defendants urge that they were not guilty of any negligence. They say that the real issue in the case is "who left the door open?" They point out that it was

not shown that the defendants or their agents left the door open, that the defendants knew that the door was open, or that the door had been left open long enough to impute to them notice of that condition. They assert that the tenants and subtenants were allowed to use the elevator as a matter of convenience; that plaintiff's office was on the third floor; that instead of walking up the stairway, he had over a period of many years used the elevator whenever it was at the ground floor; that on such occasions he would leave it at his floor so that he could use it in returning to the ground floor; that he was well advised of the custom of other tenants to do the same thing, and that it does not lie in his mouth to say, after becoming part and beneficiary of a system which was a convenience for him, that the owners of the building should be liable for the negligence of himself or his fellow tenants. Plaintiff maintains that defendants were guilty of negligence which proximately caused the accident, and that the issue is not as to who left the door open, but whether the defendants were guilty of negligence in the maintenance of the building. Plaintiff points out that defendants owed a duty to the tenants and subtenants to exercise ordinary care for their safety, and that defendants furnished a stairway light on every floor in the building except the first floor, where it was needed most; that not only was there no light in the lobby but that none could be turned on because the switches were locked; that no light could be obtained except by turning on the light in the elevator and that the plaintiff was endeavoring to do this when he was injured. Plaintiff insists that the failure to light the lobby, apart from the negligent failure to keep the elevator door closed, in and of itself, would impose liability on the defendants, and urges that the duty of defendants to exercise reasonable care to safely maintain common ways under their control was fundamen-

tal and nondelegable. Furthermore, plaintiff places great reliance on the provision of section 1657(d) of the Revised Chicago Code of 1931, which reads:

"All hoistways, hatchways, elevator wells and wheel holes in any building, whether occupied or vacant, shall be securely fenced, enclosed or otherwise safely protected, and it shall be the duty of the owner, occupant or agent of any such building to keep all such means of protection closed at all times, except when it is necessary to have the same open in order that the said hatchways, elevator or hoisting apparatus may be used."

Plaintiff asserts that under the provisions of the ordinance, the duty of keeping the elevator doors closed rested on defendants. He further insists that in any event the negligence of defendants in failing to light the lobby, joined and concurred with the negligence of the person who left the door open, was the proximate cause of the accident. Defendants argue that it is only fair that if plaintiff wanted the benefit and convenience of using the elevator himself, he should take the risk that some other tenant availing himself of the same privilege, would be negligent, and that if any such rule is to be applied as is contended for by plaintiff, then the management of the building is driven to do one of two things: furnishing the elevator service and increasing the expense to the tenants, or saying to the tenants, "You may not use the elevator." Defendants assert that the practice of the tenants using the elevator was an indication that it was a convenience to them, and that no rule or law ought to be announced which would preclude the management of the building from extending that accommodation for fear of being held liable for the negligence of the very persons accommodated. Defendants suggest that the landlord could not be expected to hire a man to follow his tenants around and keep the elevator doors closed at the very time when the land-

lord was saying he would not furnish elevator service because that would require the hiring of an operator during that period, and that if, as between the landlord and tenant, the landlord is assuming an obligation to keep the elevator doors closed, he might just as well furnish elevator service. Furthermore, defendants point out that the ordinance places the duty to keep the elevator door closed when not in use on the "owner, occupant or agent"; that an occupant of a building who is using an elevator has precisely the same responsibility to keep the elevator door closed as does the owner; that the ordinance does not single out the owner and place upon him the duty to keep doors closed unless he or his agents are the ones who are running the elevator; that the ordinance plainly indicates that the duty to keep the doors closed depends upon the situation in each case; that the ordinance establishes a rule of reasonable care that the elevator doors should be kept closed except when necessary to have the same open in order that the elevator may be used; and that the ordinance does not change any common law rule of liability between the landlord and the tenant, or between a third person on the one hand and the landlord on the other. Defendants assert that the burden was on the plaintiff notwithstanding the ordinance to show not only that the elevator door was open, but also that the defendants or their agents opened it, and that proving a mystery—that no one knows who opened the door—is not sufficient to impose liability under the facts of this case, where tenants such as the plaintiff were using the elevator in the absence of building employees. Defendants say that the fact that violation of an ordinance may be *prima facie* evidence of negligence, does not answer the question—What constitutes a violation of the ordinance? Defendants further state that the fact that violation of an ordinance is *prima facie* evidence of negligence does not excuse the plaintiff from show-

ing that it was the defendants who violated the ordinance. Defendants maintain that where there is a division of use of an instrumentality such as an elevator in this case, the plaintiff should not be permitted to recover from the defendants without proving that the defendants were the ones guilty of the negligence because it is entirely unjust to impose upon the owners liability for the negligence of their tenants. Defendants assert that the complaint does not charge them with being insurers of the plaintiff's safety, and that the ordinance does not make them insurers. Defendants also charge that plaintiff successfully urged in the trial court that the cotenants of plaintiff were "vice-principals" of the owners.

We have carefully read the cases cited by the respective parties. In each of these cases the opposing party has been able to point out a distinguishing feature or features, which it is claimed, renders the cited case inapplicable to the factual situation before us. We agree with plaintiff that defendants owed to their tenants the duty to exercise ordinary care for their safety. We are of the opinion that the defendants, as landlords, at all pertinent times, retained control over the building. This was a five-story office building, tenanted largely by doctors and dentists who have what is known as a neighborhood practice. The tenants frequently had occasion to use their offices on Sunday and at other times when the regular elevator operator was not on duty. Defendants furnished keys to the tenants. A fair inference from the evidence is that the tenants, including plaintiff, were invited to enter the building after hours, and that defendants knew that the tenants, including plaintiff, frequently came to the building after hours, and that the tenants frequently used the elevator after hours. We agree with plaintiff that the privilege granted to the tenants to operate the elevator after the regular operator went off duty, was not a gratuity. The defendants,

knowing that over a period of years the tenants were so using the elevator, could have ordered them to desist. Presumably, the leases of the tenants expired at various times during the period when defendants were the owners of the property, and as the leases expired defendants could have insisted that the tenants give up the custom which had apparently grown into a right, of using the elevator. It cannot be doubted that the tenants had the right to use the elevator. Plaintiff relies on *Murphy v. Illinois State Trust Co.,* 375 Ill. 310, and *Steinberg v. Northern Ill. Tel. Co.,* 260 Ill. App. 538, as authority for the proposition that failure to light the lobby in and of itself would impose liability on the defendants. In the *Steinberg* case plaintiff, who was a traveling optometrist residing in Chicago, went to defendant's telephone exchange at Sheridan for the purpose of putting in a call to his home. The only means of ingress and egress to the exchange was by an inclosed stairway of two flights. The first flight had 13 steps leading ·from the street to a landing, and the second flight had 4 steps from the landing to the second floor, where the exchange was located. The stairway was steep and the steps were 8 or 9 inches wide. After completing his errand, plaintiff left the telephone office and in attempting to walk down the stairs, fell, and was injured. There was no light on the stairway at the time of the accident and the first flight of stairs from the ground to the landing was dark. In sustaining judgment for the plaintiff, the court said (541) :

"Defendant was maintaining a public telephone exchange. The only means of access to it was through the stairway and hall and the public was impliedly invited by the defendant to use them. Whether or not the defendant had leased or had control of the hall and stairway is immaterial. An invitation to enter premises carries with it the duty toward the person invited to provide reasonably safe, means of ingress and

egress. (45 C. J. 834 Negligence.) An owner or occupant of land who, by invitation, express or implied, induces or leads others to go upon premises for any lawful pupose is liable for injuries occasioned by his negligent failure to keep the land or its approaches in a reasonably safe condition. (*Calvert v. Springfield Electric Light & Power Co.*, 231 Ill. 290; *Bennett v. Louisville & Nashville R. Co.*, 102 U. S. 577, [26 U. S. L. Ed. 235]; 20 R. C. L. Negligence 56-57.''

It will be observed that in the *Steinberg* case it was not claimed that there was any defect in the stairway, the accident being caused solely by plaintiff's inability to see in the darkness. Defendants seek to distinguish the *Steinberg* case by pointing out that it was the duty of the telephone company to keep the hall and stairway in a reasonably safe condition and sufficiently lighted so that the patrons of the exchange, which was open for business at the time of the accident, could see their way sufficiently to avoid the danger of falling, and that the normal condition of things demanded a light in order to be safe, whereas, in the instant case the accident was caused by an abnormal condition, the elevator door being improperly propped open by some unknown person. Defendants also point out that the misfortune of plaintiff in the instant case was not caused by improper construction of the elevator, and argue that it was not caused by an absence of light which would be necessary under normal operating conditions, but that under normal conditions the light was wholly unnecessary. In the *Murphy* case one of the charges of negligence was the failure of defendant to light a rear approach near an open cellar, by reason whereof the plaintiff, an invitee, fell through the open door and was injured. The court sustained a judgment for plaintiff. Miss Murphy alleged that she fell because of the negligence of the defendant in not hav-

ing the cellarway surrounded by a guard-rail of some kind, and in not having the back porch around the cellarway sufficiently lighted. There was evidence that there was a lamp socket on the porch, but it was not used. Defendants point out that in the *Murphy* case the negligence charged was a combination of wrongful construction, plus an absence of light, and that had there been a light then the wrongful construction, namely the omission of a proper guard-rail, might have prevented the accident. Defendant also states that in the *Murphy* case it was up to the landlord to furnish either an adequate guard-rail or a light, which would enable her to see that there was no guard-rail. They state that the *Murphy* case is totally unlike the instant case, where no charge of wrongful construction of the elevator or elevator doors has been made. In sustaining the judgment in the *Murphy* case, the Supreme Court said (313):

"The rule is that where only a portion of the premises is rented and the landlord retains control of other parts of the same such as stairways, passageways, or cellarways, or where he rents the premises to several tenants, retaining control over a part of the same for the common use of the several tenants, he has the duty of exercising reasonable care to keep the premises in a reasonably safe condition and he is liable for an injury which results to persons, lawfully in such place, from failure to perform such duty. *Shoninger Co. v. Mann*, 219 Ill. 242."

It is difficult to understand why in the instant case defendants lighted the hallways on the floors above the ground floor, but did not light the lobby. A consideration of all the facts and the cases cited convinces us that the failure of defendants to light the lobby and the negligence of the person who propped open the elevator door, presented to the jury a situation which

justified a finding that such failure to light the lobby was one of the proximate contributing causes of the accident, without the negligence of both of which it would not have occurred. (*Annen v. W. F. McLaughlin & Co.*, 189 Ill. App. 261.)

We now turn to a consideration of the charge that defendants are liable because of the provisions of the ordinance that the doors of elevator shafts should be kept closed, except when necessary to have the same open in order that the elevator may be used. The ordinance imposes the duty upon the "owner, occupant or agent." Where the owner rents the entire premises and retains no control over the elevator, it is obvious that such owner would not be liable. In that situation the occupant would be liable. We have read the numerous cases cited by the respective parties on this proposition. There is a wide diversity of opinion. An extended discussion of these cases would not be helpful. We have stated that we agree with the position of plaintiff that the privilege granted to the tenants to operate the elevator when the regular operator was off duty, was not a gratuity. The ordinance must have a reasonable construction. Elevators and elevator shafts are dangerous mechanisms. The ordinance clearly contemplates that some owner, occupant or agent will be responsible that such elevators and shafts do not become traps. In the instant case defendants retained complete control of the building and all its appurtenances. Their engineer lived in the building and occasionally walked around the premises when the other employees were off duty. We agree with plaintiff that as long as defendants retained complete control of the building they could not delegate their duty under the ordinance. To do so, would be to shift the responsibility of the landlord to unknown persons. Defendants argue that when the regular operator went off duty the responsibility imposed by the ordinance shifted from the defendants to the various

tenants and occupants, as each one used the elevator. It is, of course, true that the tenant who propped the door open would be liable in any event. The present case is a good indication of how difficult it would be for an injured party to ascertain who left the door open. Our view is that under the Chicago ordinance the defendants, by giving the tenants permission to use the elevator, did not divest themselves of control and remained liable for negligence in the operation of the elevator and the shafts and appurtenances thereto. It follows that the court did not commit error in submitting the case to the jury on the proposition of the liability of defendants because of negligence in leaving the door to the elevator shaft open contrary to the ordinance.

Defendants insist that plaintiff was guilty of contributory negligence and point out that the night was dark, the lobby of the building was dark, the lights were off, that he used neither the flashlight which he had with him, or matches, to light his way; that he was not faced with any unexpected condition; that he knew the door of the building would be locked and the lights would be out' and that the elevator would not be in charge of any operator. He also knew that the lobby lights were operated by a key switch and that he could not turn them on, and he knew that the tenants frequently operated the elevator and that the key or rod to open the elevator was openly available to all, on top of the building directory. Defendants submit that under these circumstances he was guilty of contributory negligence. Plaintiff replies that on this occasion he acted precisely as he had many times before; that the lobby was dark, but under all the circumstances with which plaintiff was familiar it was a place of safety and not one of danger; that there was nothing in his past experience that would indicate that he would need a light any more than he would need one in walking across his own bedroom; that

while he had a throat light in his bag, he testified that at the time of the occurrence he was not sure that he had it with him; that he had no reason to suspect that anything was wrong; that there was no evidence that he had any matches or other means of striking a light, and that he justifiably believed that the elevator door had to be closed before the car could be moved from the floor. We are of the opinion that this is an appropriate case for the application of the views expressed by our Supreme Court in *Kelly v. Chicago City Ry. Co.*, 283 Ill. 640, 645:

"As a general proposition, the question of contributory negligence is one of fact for the jury under all the facts and circumstances shown by the evidence. (*Bale v. Chicago Junction Railway Co.*, 259 Ill. 476,) but cases occasionally arise in which a person is so careless or his conduct so violative of all rational standards of conduct applicable to persons in a like situation that the court can say, as a matter of law, that no rational person would have acted as he did and render judgment for the defendant. This is not one of those cases."

We conclude, as did the Supreme Court in the last mentioned case, that in the instant case the trial judge acted properly in submitting to the jury the proposition as to whether plaintiff was guilty of contributory negligence.

Defendants criticize the action of the trial judge in giving, at the request of plaintiff, the following instruction:

"It is alleged in the plaintiff's complaint that on March 13th, 1938 the defendant owned and had control of a building at 2376 East 71st Street, in Chicago, and had control of the elevator, stairways and other portions of the building used in common by the tenants thereof; that on said date the plaintiff was and for a long time had been a tenant in the said building; that it was frequently necessary or desirable for the plain-

tiff and other tenants to go to their offices on Sundays, holidays and at other times before and after regular office hours, and to use the elevator in said building to convey them from the lobby or ground floor to their respective offices; that the tenants of the said building, including plaintiff, used the said premises, as aforesaid, and the said elevator with the knowledge, permission and consent of the defendants; that on and prior to said date there was in effect in Chicago a certain ordinance which provided that elevator wells in any building should be securely fenced, enclosed or otherwise safely protected, and made it the duty of the owner of any such building to keep all' such means of protection closed at all times except when it was necessary to have them open in order to operate the elevator.

"It is further alleged that at said time and place the defendants: (a) After dark, carelessly and negligently allowed a certain door provided and placed as a guard to the opening to said elevator shaft at the main or ground floor of said building to be and remain open and out of position for safety when the said elevator was not at that floor, thereby, leaving said opening to said elevator shaft entirely open and unprotected against the danger of anyone near said opening falling therein. (b) After dark, carelessly and negligently failed to securely fence, enclose or otherwise safely protect said elevator shaft and carelessly and negligently failed to keep the means of protection of said elevator shaft closed at all times except when it was necessary to have the same open in order that said elevator might be used, contrary to the provisions of Section 1657 (d) Revised Chicago Code 1931, then and there in full force and effect. (c) Carelessly and negligently failed to guard the said elevator shaft, and carelessly and negligently failed to keep and maintain suitable and sufficient lights burning in, on or near said elevator, elevator shaft, and the approaches thereto, after dark, notwithstanding the defendants

had notice and knowledge or could have had such notice or knowledge, in the exercise of ordinary care, that the plaintiff and other tenants of the building might be in and upon the said premises and using the aforesaid elevator.

"If you believe from a preponderance of the evidence, under the instructions of the court, that the plaintiff has proved that the defendants were guilty of negligence, as above set forth and as alleged in his complaint, and that such negligence, if any, caused or proximately contributed to cause the accident and injury complained of in this case, and that the plaintiff was then and there and prior thereto in the exercise of ordinary care for his own safety, then you should find the defendants guilty."

Defendants declare that this instruction was harmful in a number of ways. They assert that it consists of many apparently positive assertions in two long paragraphs with the statement made only at the beginning of the first paragraph that such assertions are those alleged in the plaintiff's complaint. They say that the first paragraph consists of no fewer than six rather lengthy clauses, and that while on the printed page it is easy to see that each of the clauses is grammatically controlled by the opening words "it is alleged," when the paragraph is read aloud simply as a part of a series of instructions, the mind very quickly accepts the statements as statements of fact rather than as mere allegations of plaintiff's complaint. We are of the opinion that the jury would understand from the first paragraph of this instruction that the assertions are the allegations of plaintiff's complaint. Defendants concede that on the printed page it is easy to see that each of the clauses is grammatically controlled by the opening words "it is alleged," but that when the paragraph is read aloud as a part of a series of instructions, the mind accepts the statements as state-

ments of fact rather than as allegations of the complaint. We do not agree that when the paragraph is read aloud the jury would misunderstand the meaning intended to be conveyed by the court. It should be borne in mind that after the instructions were read they were taken to the jury room by the jury, where the jurors had an opportunity to read the instructions. Defendants assert that the instruction cannot be excused on the theory that the trial court was charging the jury as to the issues because almost all of the statements made in the first long paragraph are allegations about which there are no disputes, and which were not issues in the case. Defendants complain that the inclusion of these allegations was damaging to defendants in that the tendency of a jury listening to a long recital of undisputed allegations is to accept the entire statement as correct, and that instead of defining the issues, an instruction of this character tends to obscure them. There is much to be said in favor of defendants' views. However, we are satisfied that the jury after having listened to the opening statements of counsel, the presentation of the evidence and the arguments of counsel, would have a good understanding as to the points in dispute between the parties, and would not be led subconsciously to believe, because some of the allegations were undisputed, that all of them were undisputed. Defendants further criticize this instruction because the second paragraph commences with the language ''it is further alleged'' without saying where or by whom it is alleged. Defendants fear that the jury might understand that the court was making the allegations. They state that there was a serious possibility that this interpretation would be given to the second paragraph because of the concluding paragraph of the instruction, which tells the jury that ''if you believe from a preponderance of the evidence, under the instructions of the court, that the plaintiff has proved that the defendants were

guilty of negligence, as above set forth and as alleged in his complaint, and that such negligence, if any, caused or proximately contributed to cause the accident and injury complained of in this case, and that the plaintiff was then and there and prior thereto in the exercise of ordinary care for his own safety, then you should find the defendants guilty.'' They state that the words of the concluding paragraph are open to the interpretation by a layman that there were two sets of negligence alleged—those set forth by the court and those alleged by plaintiff's complaint. We are of the opinion that defendants' fears are groundless. The jury would understand that the court was informing them as to plaintiff's allegations. As reasonable men, the jurors knew that the court was not making any allegations. Defendants urge that subparagraphs (a) to (c) of the second paragraph of this instruction sound, when read aloud, like independent statements of fact; that when read from the printed page each is independently punctuated with a period, and in both instances are all remote from the words ''it is alleged in the plaintiff's complaint.'' These subparagraphs all follow a common clause ending with a colon. We agree with plaintiff that each of these subparagraphs must be read in conjunction with the introductory clause. In discussing subparagraph (c), defendants complain of the remoteness of this language from the idea expressed at the beginning that they are simply allegations of the plaintiff's complaint. We are of the opinion that the jury would understand this instruction as telling them that the assertions were the allegations of the complaint. Defendants further object to this instruction by stating that in subparagraph (a) the words ''carelessly and negligently'' appear once; in subparagraph (b) they appear twice and in subparagraph (c) they appear twice, or a total of five times in the complete paragraph. They assert that the paragraph is care-

fully designed to condemn the defendants by a repetition of plaintiff's allegations couched in the language of plaintiff's complaint; that the instruction is needlessly repetitious if the only aim of the plaintiff is to inform the jury as to what the issues are in the case. The action is based on negligence. It was necessary for plaintiff to charge negligence in order to state a cause of action. We do not believe that the instruction needlessly repeated the words "carelessly and negligently." Defendants call attention to the fact that the third paragraph of the instruction does not caution the jury that the recitals theretofore made by the court in the instruction are simply the allegations of the plaintiff's complaint. Defendants emphasize that point because they say that certain cases which condemn the practice typified by this instruction have held the instruction not to be reversible error, where at the close of the instruction the court again makes it clear that the statements in the instruction are simply the allegations of plaintiff. It is true that the instruction does not have the cautionary direction that the recitals theretofore made by the court in the instructions are simply the allegations of plaintiff's complaint. Nevertheless, we believe that the jury would understand that the assertions were merely the allegations of the complaint.

Defendants contend that the attempted summary of plaintiff's complaint with respect to the Chicago ordinance is inaccurate and vitally prejudicial when applied to the facts of the case; that the instruction states that at the time of the misfortune to plaintiff there was in effect in Chicago a certain ordinance which provided that "elevator wells in any building should be securely fenced, inclosed or otherwise safely protected, and made it the duty of the owner of any such building to keep all such means of protection closed at all times except when it was necessary to have them open in order to operate the elevator."

Defendants also state that the allegation in the complaint places the duty not solely on the owner, as in the instruction, but on the "owner, occupant or agent." Our discussion as to the application of the ordinance disposes of this point. In our opinion, under the factual situation presented by the record, the ordinance imposed upon the owner the duty of keeping the doors of the elevator shafts closed. Hence, the court properly omitted the words "occupant or agent."

Defendants state that the practice of setting out at length all of the allegations of the complaint has been repeatedly condemned, but that in each case some feature of the instruction or the clearness of the evidence saved the plaintiff from reversal. The most recent pronouncement on this subject appears in the case of *Goldberg v. Capitol Freight Lines, Ltd.,* 314 Ill. App. 347. In that case the instruction complained of set forth most of the allegations of the complaint, and concluded by telling the jury that if they believed from a preponderance of the evidence and under the instructions of the court, plaintiff had proved that defendants were guilty of one or more of the particular acts of negligence as set forth in the instruction, and that such negligence caused or proximately contributed to cause the accident, they should find the issues for the plaintiff. The attorneys for the plaintiff in that case are the attorneys who represent the plaintiff in this case and much of the language is the same as that of the instruction complained of now. Mr. Justice O'CONNOR, speaking for the court, said (360):

"We disapproved of the giving of a somewhat similar instruction in *Cooney v. Hughes,* 310 Ill. App. 371, but we did not reverse the judgment on that account, but said that so far as we were informed, a judgment had not been reversed by a court of review in this State on account of the giving of a similar instruction. We there also said: 'We think the jury here was not misled. The facts were simple, the issues easily un-

derstood. We do disapprove instructions of this character,' and we are still of the same opinion but when such an instruction is given, the court, in passing on its propriety, must keep in mind whether a number of adverbs are used or other coloring given to the allegations of the complaint. (Compare *West Chicago R. R. Co. v. Lieserowitz*, 197 Ill. 607; *Liska v. Chicago Rys. Co.*, 318 Ill. 570.) In the instant case we think the jury understood the issues involved. They were not so complicated as to confuse jurors who have the qualifications required by the law. Moreover, the court, at the request of the Bus Company, advised the jury that the complaint was an unsworn statement and did not tend to prove anything, and further, that the burden of proof was on plaintiff and not on defendant to prove the misconduct charged in the complaint.''

In the instant case we are likewise of the opinion that the jury understood the issues. In *Central Ry. Co. v. Bannister*, 195 Ill. 48, the Supreme Court said (49):

''The language of the instructions criticized is to the effect that if the jury believe from the evidence, that the defendant was guilty, etc., as alleged in the declaration or some count thereof, they should find for the plaintiff. It seems to be thought improper to thus refer the jury to the charge of negligence alleged in the declaration. Had the instructions copied the allegations no objection could have been urged to them.'' In *West Chicago St. R. Co. v. Lieserowitz*, 197 Ill. 607, the court said (610):

''The instruction first states the claim made by the appellee, as stated in her declaration. This feature of the instruction is certainly unobjectionable under the decisions of this court. An instruction, telling the jury that, if they believe from the evidence the plaintiff has proved his or her case, as laid in his or her declaration, they will find the issues for the plain-

tiff, has been held to be unobjectionable. (*Mt. Olive Coal Co. v. Rademacher*, 190 Ill. 538, and cases cited.)''

The true rule appears to be that it is the duty of the court to define the issues to the jury. We cannot find any case where our Supreme Court has found fault with the practice of defining the issues by telling the jury the allegations of the complaint. There are, of course, cases where it would be improper to employ the language of the complaint in informing the jury as to the issues, as, for instance, where there is no competent evidence to support the allegations. From an examination of the authorities, we conclude that the better practice would be to define the issues to the jury without referring them to the pleadings. However, if the issues are defined, the fact that the jury is told of the allegations in the pleadings is not harmful. In *Reivitz v. Chicago Rapid Transit Co.*, 327 Ill. 207, the court considered an instruction covering nearly two printed pages of the abstract and consisting of three paragraphs. The instruction recited the allegations of the two count declaration. Our Supreme Court said (212):

''It is important that the issues be explained to the jury, but they should be stated clearly and concisely and all charges that are to be disregarded should be eliminated. · (*Dickson v. Swift Co.*, 238 Ill. 62.) The mere fact that allegations of the declaration are copied into an instruction does not render it objectionable. (*Liska v. Chicago Railways Co.*, 318 Ill. 570; *Krieger v. Aurora Elgin and Chicago Railroad Co.*, 242 id. 544; *Central Railway Co. v. Bannister,* 195 id. 48;) but the incorporation into an instruction of the declaration with all its charges, some of which, after the proof is in, may be disregarded, tends to confuse the jury.''

The court did not reverse the judgment and stated that whatever error there was in the verbose recital

of the charges in the declaration was cured by other instructions. From this case it appears that it is important that the issues be explained to the jury, that the issues should be stated clearly and concisely and that all charges that are to be disregarded should be eliminated. The instruction reciting the allegations of the first count of the declaration and concluding with the statement that if the jury found from a preponderance of the evidence, under the instructions of the court, that the plaintiff had proved his case as alleged in the count, then the jury should find the defendants guilty, was approved in the case of *Liska v. Chicago Railways Co.*, 318 Ill. 570, 578.

Finally, defendants argue that the court erred in giving the following instruction:

"On the date of the accident and injury complained of by the plaintiff in this case, there was in full force and effect in the City of Chicago, Illinois, a certain ordinance which provided and provides as follows: 'All hoistways, hatchways, elevator wells and wheel holes in any building whether occupied or vacant, shall be securely fenced, enclosed, or otherwise safely protected, and it shall be the duty of the owner, occupant or agent of any such building to keep all such means of protection closed at all times except when it is necessary to have the same open in order that the said hatchways, elevator or hoisting apparatus may be used.' "

Defendants urge that this is an abstract statement of the law and does not apply to the facts of the case, that the jury was not told what constituted a violation of the ordinance, nor whether the violation was conclusive against the defendants, or only *prima facie* evidence of negligence. Defendants cite the case of *Burke v. Zwick*, 299 Ill. App. 588, in support of the proposition that the giving of an abstract instruction is reversible error wherever it appears that the jury may

have been misled. They state that where the action is based upon a statute such as the Mining Act (*Mt. Olive & Staunton Coal Co. v. Rademacher*, 190 Ill. 538,) the Dram Shop Act (*Danley v. Hibbard*, 222 Ill. 88), the Federal Employers' Liability Act (*Sells v. Grand Trunk Western Ry. Co.*, 206 Ill. App. 45), the Injuries Act (*Greene v. L. Fish Furniture Co.*, 272 Ill. 148), then it is not erroneous to give an instruction on the statute in the language of the statute. Our view is that this instruction could not harm the defendants. The jury was informed about the ordinance in the instruction we have previously discussed. An instruction in the words of a statute, in a case based upon a statute, has been approved in numerous cases. We are of the opinion that the same rule is applicable to an instruction given in a case based on the violation of an ordinance.

For the reasons given, the judgment of the circuit court of Cook county is affirmed.

*Judgment affirmed.*

KILEY, J., concurs.

HEBEL, J., concurs with the conclusion reached by the court, but does not agree with everything that is said by the court in its opinion.