Edward F. Goertz, Plaintiff-Appellee, v. Chicago and North Western Railway Company, Defendant-Appellant.

Gen. No. 47,273.

First District, Second Division.
October 21, 1958.
Rehearing denied November 13, 1958.
Released for publication November 13, 1958.

263

Carl McGowan, Edward Warden, James M. Redding, Edgar Vanneman, Jr., of Chicago, for defendant-appellant.

James A. Dooley, of Chicago, for plaintiff-appellee.

PRESIDING JUSTICE LEWE delivered the opinion of the court.

This is a personal injury action. The jury returned a verdict finding defendant guilty and assessed plaintiff's damages at $300,000, and also returned a special finding that plaintiff was in the exercise of due care. Judgment was entered accordingly. Defendant's post-trial motions were denied and defendant appeals.

On April 13, 1954, plaintiff was a passenger on one of defendant's commuter trains from Chicago to Des Plaines, Illinois, a regular stop. The train was travelling over the middle of three tracks which run through Des Plaines in a northwesterly direction. At the Des Plaines station this track is bounded on the south by a concrete platform and on the north by a wooden picket fence. The platform and the three tracks are intersected by a wooden crosswalk near the middle of the station, which is bordered on the east and west by Pearson and Lee Streets respectively. These street crossings are protected by flasher signals and gates.

There were six cars in the train but the forward car was not in use. The conductor and a forward and a rear brakeman were looking out for, and handling, passengers. One of these trainmen was working between the second and third cars from the front, another between the third and fourth cars, and the third at the rear platform of the last car. Plaintiff was riding in the next to the last car. The doors at the car exits, at both ends of each car were open the day of the occurrence, allowing free ingress and egress. The cars were about 80 feet in length and the engine approximately 75 feet long. One standing alongside the train or on the bottom step of a car exit could not see anyone on the bottom step at one of the other exits.

The train entered the station at approximately 2:09 P. M. It stood at the platform for a period of time ranging, according to the evidence, from 25 seconds to a full minute before starting. The gates were down during the time the train was in the station. Mr.

265

Brackus, the rear brakeman, gave the signal to start the train. This was passed to the engineer who set the train in motion. The train travelled approximately 60 feet when several witnesses saw the plaintiff fall under the wheels and called out for it to stop. As the train passed over him, plaintiff was dragged to a point about 13 feet east of the middle crosswalk.

The complaint charges general negligence in the operation, maintenance and control of its train, and specifically alleges that defendant started its train before plaintiff had an opportunity to get off the train safely; that defendant failed to warn plaintiff when the train was about to start; and that defendant failed to keep a proper lookout for plaintiff as he was leaving the train.

■ Defendant contends that the court should have directed a verdict because plaintiff did not show he was in the exercise of due care and that defendant was not negligent as a matter of law. We see no merit in this contention. Plaintiff's account was the only evidence bearing directly on the events which occurred immediately prior to his stepping to the platform. He testified that when he saw the train entering the station, he made preparations to leave. After several passengers passed his seat, he started to go to the rear of the car to get off. He stated that as he was holding onto a grab iron and stepping to the station platform with his left foot, the train with no warning to him started, causing him to stumble and then fall under the train. The favorable evidence and the legal inferences drawable from it were enough prima facie on the question of due care.

■ Defendant argues that since the sole duty resting upon a carrier, after conveying its passengers in safe manner to their respective destinations, is to stop the conveyance for a sufficient time to allow them to

266

depart safely, there is no evidence here of its negligence proximately causing plaintiff's injuries. What was a sufficient time to keep the train standing at the platform that day was a question of fact to be determined by the jury in the light of facts and circumstances then existing. The uncontroverted facts are, that defendant's trainmen were unable to see anyone in any of the car exits; that there were no trainmen working within a car's length of the point where plaintiff was attempting to alight; that passengers were allowed free ingress and egress; and that defendant's train was started on a silent signal "highball" without audible warning to plaintiff. Considering the invitation to plaintiff to alight, as gathered from the evidence that the train was standing still with the doors open, and the fact that other passengers had alighted before him, we cannot rule that as a matter of law defendant's sole duty was to stop the train for a period of 25 seconds.

■ Defendant's argument does not persuade us that where the train has remained standing a reasonable time, it may again be set in motion, with no obligation to ascertain whether everyone has departed who intended to do so and no responsibility to examine each car platform to discover whether someone might be in the act of alighting. It cites Lake Erie & W. R. Co. v. Beals, 50 Ind. App. 450. That case is not in accord with decisions of this court. In Jurkiewicz v. Ill. Cent. R. Co., 145 Ill. App. 44, the court with respect to that argument pointed out at page 50, that:

"It leaves out of consideration the important element that appellant owed to appellee the utmost or highest degree of care, skill and diligence for her safety consistent with the mode of conveyance employed; and the appellant's servants in charge of the train were required to know, if by the exercise of due care, cau-

267

tion and diligence they could know, that appellee was attempting to alight from the train, before they started it."

Defendant's contention that the verdict is against the manifest weight of the evidence is without merit. Its argument that the physical facts contradict plaintiff's story is made in reference to a plat of the station and approximate position of the train that day as taken from the testimony of the witnesses. But we are not convinced that the record conclusively indicates that this was the exact position of the train, as defendant contends. The testimony of forward brakeman Bolin was that the engine stopped just about clear of the Lee Street (west) crossing. Furthermore, in view of the fact that the first car behind the engine was not in use, it was unnecessary to stop the engine and forward car in a position opposite the platform. Instead, it would seem reasonable that the train may have pulled up farther in order to allow the passengers to alight nearer the crosswalk, which they all had to use to get to the north or south platforms. Defendant's graphic description of the distances covered by other passengers who had alighted, and its argument that this conclusively showed plaintiff had sufficient time to alight is not convincing on this question of law. Should the jury have decided that the train didn't stop where defendant indicates that it did, plaintiff would have been in a position 75 feet, the length of the engine, closer to the crosswalk. This would also tend to corroborate plaintiff's statement that he got off at a point near the croswalk. The rear brakeman, on cross examination, became confused as to when and where he first saw plaintiff; the testimony of witness Harris contained improbabilities; and witness Raven said he could not tell whether the man he saw get up after the train had started was the man who was hurt.

Defendant's argument that since plaintiff was coming from the center of the car, the forward motion of

the train would throw him clear, rather than cause him to fall under the train is equally without merit. No witness denied plaintiff's testimony that he had a firm grip on a grab iron, and continued to hold on until he was forced to lose his grip at which time he fell under the train. The testimony that he ran alongside the train trying to gain his balance before he fell coincides with this account. That plaintiff could not clearly describe just how he fell and where is not unusual in view of the severity of his injuries and the shock he must have suffered when the train ran over him and dragged his body 13 feet.

██ Upon a review of the evidence we cannot say that the finding of defendant's negligence is against the manifest weight of the evidence. "Manifest means clearly evident, clear, plain, indisputable." Schneiderman v. Interstate Transit Lines, Inc., 331 Ill. App. 143. It ". . . requires that an *opposite* conclusion be clearly evident." Arboit v. Gateway Transportation Co., 15 Ill.App.2d 500, 507. (Emphasis ours.) A finding of no negligence is not clearly evident here.

██ The same is true, a fortiori, of the finding of due care. The special interrogatory is amply supported by the evidence and defendant made no objection to the finding in the interrogatory and did not preserve the point. Westlund v. Kewanee Public Service Co., 11 Ill. App.2d 10. No showing is made that the trial court abused its discretion in refusing to permit an amendment to the post-trial motion, for the purpose of objecting to the special interrogatories, nearly three months after verdict.

██ Defendant also complains of error in the giving of instructions on behalf of plaintiff, and in the rejection of instructions it tendered. Instruction number 12 was proper. It told the jury what acts of negligence were charged in the complaint. The specific charge following the general charge of negligence limited the jury's consideration rather than freeing them to "wan-

269

der afield." The specific charges particularized rather than superseded the general charge.

■■ We do not agree that the court in saying that the plaintiff charges the following "acts of negligence" in effect told the jury that such acts were negligence. The court said that plaintiff "alleged" defendant was guilty of these negligent acts and explained in another instruction that the allegations in the pleadings were merely unsworn statements and claims, not tending to prove or disprove any allegation contained in the pleadings. The court was obligated to define the issue for the jury. Lotspiech v. Continental Illinois Nat. Bank & Trust Co., 316 Ill. App. 482, and we think he did so properly.

■■ Plaintiff's instruction number 5 required defendant to do ". . . all that *human care, vigilance* and *foresight* can reasonably do . . ." (Emphasis ours.) Defendant argues this unduly emphasized its duty through repetition of these words. The language has been repeatedly held good. Chicago City Ry. Co. v. Bundy, 210 Ill. 39. Defendant insists that such language imposes a duty, in the minds of the jury, to foresee that plaintiff might try to jump off the train. All the law pertinent to the issues in a case need not be stated in a single instruction. In view of plaintiff's instruction number 7, requiring that plaintiff exercise due care in his own behalf and defendant's instruction P that a carrier is not an insurer, this argument is not convincing.

■■ The court correctly refused to give defendant's instruction J for the reason that it directed a verdict for defendant in assuming an evidentiary fact, that "a train has remained standing a reasonable length of time to enable . . . passengers to depart . . . ," and in failing to include the essential element of care required of defendant. Here defendant not only had a duty to stop the train, but also a duty to discover whether plaintiff was attempting to alight,

270

if it could do so in the exercise of "due care, caution and diligence." Jurkiewicz v. Ill. Cent. R. Co., 145 Ill. App. 44. Defendant's tendered instruction R was properly refused for the same reason as its tendered instruction J.

■■■■■■ Defendant's contention that it was entitled to its "evenly balanced" instruction regarding the burden of proof required of plaintiff is without merit. The court is required to instruct the jury on each point of law in a particular case. Plaintiff's instruction number 4 requiring plaintiff to establish his case by the greater weight would not permit the jury to decide an "evenly balanced" case favorably to plaintiff. They were expressly instructed that the evidence had to preponderate in plaintiff's favor before he was entitled to a verdict.

■■■ The use of large type and print in plaintiff's instructions is not reversible error within the rules of the cases cited by defendant. The practices condemned in these cases are those of labeling instructions "Plaintiff" and "Defendant" Indiana, I. & I. R. Co. v. Otstot, 212 Ill. 429, and the underscoring, italicizing and use of quotation marks in certain portions of instructions, thereby highlighting these portions and undervaluing the remainder. Wright v. Brosseau, 73 Ill. 381. The instructions before us exhibit no such undue emphasis. Simply because a party submits an instruction, there is no presumption that it is more favorable to him than another. The instructions here are clear and fair statements of the law applicable to the issues involved. We see nothing in them, in form or substance, that would indicate that they might operate favorably to plaintiff to the prejudice of defendant.

■■■■■■ Defendant claims error in the reading of statements from plaintiff's deposition by his counsel on redirect examination, because this tended to bolster testimony given on direct examination. The deposition was first referred to by defendant on cross examina-

271

tion to contradict plaintiff's testimony that he heard no warning and that he started to get off the train while it was standing still. A party impeached or contradicted at the trial by statements made prior to that time, may use the same document to qualify or explain what has been testified to ". . . if a party proves what was said by the adverse party to the suit as evidence against him, such adverse party has a right to prove all that was said by him. . ." Norton v. Clark, 253 Ill. 557, 564. That the statements in the deposition were repetitious of those made on direct examination is immaterial in view of the fact that defendant contended that they were contradictory.

Defendant claims error in the permission to plaintiff to impeach on immaterial matters. In view of defendant's contention that plaintiff stepped off the train after it was in motion, it became quite material here whether Brackus first saw plaintiff stepping from the train or after he had stepped onto the platform. Defendant's witness Harris was an important witness on this point also. He was unable to recall whether someone asked him for a statement for plaintiff concerning the accident. It was material to show that he refused to give such a statement. Neither was defendant's witness, Frank Raven, discredited on an immaterial question, the time after the accident when he first saw defendant's representative and who it was he saw. The trial court properly rejected testimony later of Raven's seminary training. Memory, powers of observation and bias are several elements a jury may consider when evaluating testimony. We see no merit in this claim.

■■■ There was no error in the court's refusing to admit defendant's plat of the station. It was a posed picture. The evidence concerning the position of the train in the station that day is not definite, and therefore, this diagram has no basis for admissibility.

Defendant's final contention is that the verdict is so grossly excessive as to require the court to grant a new trial or a substantial remittitur.

Plaintiff was born on September 21, 1892. He learned the dress cutting trade 43 years prior to the trial, and worked for 28 years for one firm. Being in good health, he lost no time for illness. Two days after the occurrence he was operated upon. As a result of the occurrence, he suffered the amputation of his left arm nine inches above the elbow and both legs ten inches below the groin. He was fitted with artificial legs, but because of their discomfort he spends practically all of his time in a wheel chair. He also has an artificial appliance for his left arm. He sleeps from three to five hours a night, and experiences painful sensations as if the missing limbs were still present.

Plaintiff's doctor, medical and hospital bills were $8,270.63. His lost wages from the date of the occurrence to judgment amount to $14,345. There was testimony that his life expectancy was 12 years. Discounted at four per cent of his annual income the present value of his future earnings amount to $46,362.40, thus making a total of past and future pecuniary loss in the sum of $69,978.03. This sum does not include pain and suffering and the deprivation of activity common to men in circumstances like plaintiff's before his injury. But, even so, we think that the verdict is clearly excessive. In support of his position, plaintiff relies on Smith v. Ill. Cent. R. Co., 343 Ill. App. 593, where plaintiff lost both limbs and had a life expectancy of about 45 years. We affirmed a judgment of $185,000. In Hulke v. International Manufacturing Co., 14 Ill.App.2d 5, where plaintiff was 29 years of age and was awarded $300,000, plaintiff's skin and flesh was burned off 80 per cent of his body. Both external ears had been destroyed. A mass burn covered

the face, scalp, upper and lower extremities, as well as a large area of the body. For over five months, Hulke was irrational. There was also evidence that he had 100 per cent disability from an "industrial angle." We think the nature and extent of the injuries in the Hulke case are readily distinguishable from the case at bar. In the Smith case the life expectancy was about 45 years as against 12 years here.

Taking all the imponderable elements which might have been considered by the jury, and giving plaintiff the benefit of all doubt, we do not feel that the evidence warrants a judgment of a sum greater than $200,000. It is ordered that if plaintiff will within twenty days file in the office of the clerk of this court, a remittitur, in the sum of $100,000, as of the date of the judgment, then that judgment will be affirmed as of the date of the original judgment; otherwise, the judgment will be reversed and the cause remanded for a new trial.

Affirmed upon remittitur to be filed within twenty days. Otherwise, reversed and remanded.

MURPHY, J., concurs.

KILEY, J., specially concurring.

In 1951 this court sustained a verdict for $185,000 in Smith v. Ill. Cent. R. Co., 343 Ill. App. 593. Leave to appeal was denied. The plaintiff there had both legs amputated at mid thigh, had a comminuted fracture of the breast bone and a straightening of the normal curvature of the spine.

In 1957 in Hulke v. International Mfg. Co., 14 Ill. App.2d 5, the Second District Appellate Court sustained a verdict for $300,000. There the injuries were the burning away of 80% of the skin and flesh of the plaintiff's body so that his muscles were visible; the structures of both ears were destroyed; an "everting" of the lower eyelids; amputation of two fingers; the

274

loss of function of the fingers, not amputated, and of both hands and the right elbow; and the damage by burning to his lower legs so that he must wear braces on both feet.

In the instant case both legs were amputated ten inches below the groin and the left arm was amputated nine inches above the elbow.

In view of the result in the Hulke case it seems unlikely that this court would disturb, as excessive, in 1958 a verdict for $300,000 in a case on all fours with the Smith case. But the injuries to Goertz are no less than those suffered by Smith, and the instant record justifies the inference that the pain and suffering of Goertz were and are and will be as bad as Smith's. In the Smith case the implication is that about $75,000, of the $185,000 total, was the probable award for the element of pain and suffering and loss of the rights of man. Assuming a case on all fours with the Smith case today with a verdict for $300,000, and making due allowance for some increase in special damages in 1958 over 1951, an award for the intangible elements would amount to roughly $200,000. The allowance for that element implied in the instant Goertz verdict was $230,-000. But Smith had 45 years life expectancy and Goertz has an expectancy of 12 years.

It may be said that these comparisons do not settle the question of the excessiveness of the instant verdict because it may be that the verdict for the injured party with the longer life expectancy may not have been adequate. In fact plaintiff argues here that the instant verdict is inadequate. It might also be said that it is fruitless to search for any norm to measure compensation for intangible painful consequences of a wrongful injury. On the other hand there must be a norm, otherwise how can the rule state that a verdict may not be set aside as excessive unless it be "wholly unwarranted," "palpably excessive" and so on. The very

275

words used in the rule presuppose a norm. There is no evidence upon which the jury can decide because there is no evidence in any record itself which tells the jury how to go about deciding how much to allow for intangibles and therefore the range of the verdict would be limitless.

But everyone admits there must be a limit. It seems to me that all of the rules on this question are referred to reason. Thus I stand by the test we applied in the Smith case, at page 612, whether reasonable men might differ on the question of whether $230,000 is too great an allowance for the pain and suffering Goertz has undergone and will undergo and for the deprivation of the privileges and enjoyments common to men in like circumstances.

The test is limited to the question of the *fairness* of the award for the intangibles, since there is evidence of plaintiff's special and intangible injuries in the record and no controversy at the trial about them.

The operable rules are clear. The assessment of damages is the preeminent function of the jury. Kahn v. James Burton Co., 5 Ill.2d 614, and their verdicts based on their assessments must not be set aside unless clearly the result of passion and prejudice. Barango v. Hedstrom Coal Co., 12 Ill.App.2d 118. The purpose of the award of damages is to repair plaintiff's injury or make him whole as nearly as that may be done by money. Harper and James, The Law of Torts, p. 1301. There appears to be no precise standard by which to accurately define compensation due to a person for the intangible consequences of wrongful injury. The answer is not to give "the sum which the plaintiff, or anyone else, would be willing to suffer the injury for." Harper and James, *ibid,* p. 1322. Also the award should be measured by what is due the plaintiff and not by what the defendant is able to pay. (Oleck, Damages to Persons and Property, p. 155, 1955 Ed.)

276

The award of $230,000 for intangibles gives an average allowance of $19,000 a year, taking only the principal amount into account, to Goertz over and above his special damages. A study of the Illinois cases, cases from other jurisdictions and federal cases cited in the briefs on the question of excessiveness shows an average allowance for pain and suffering of less than 50% of the total verdict. The relevant Illinois cases show an average allowance of about 40% of the total verdict. In the instant case the average allowed for pain and suffering was over 70%. In the Smith and Hulke cases the allowance for this element averaged out over their life expectancies to approximately $1,800 and $3,000 per year, respectively.

Applying the test adopted, in the light of the principles set forth and the considerations drawn from a comparison of the Smith, Hulke and the instant case, my opinion is that all reasonable men must agree with defendant's contention that the verdict for the intangibles is excessive. My opinion is that reasonable men would agree that it would be clearly unjust to allow roughly the same amount to two men, one of whose life expectancy is nearly four times as long as the other, and clearly unfair to require defendant to pay plaintiff $230,000 over a period of 12 years when another defendant, for substantially the same intangibles, would be required to pay less to another defendant over a period almost four times as long.

The implied value of the intangibles under a $200,000 verdict is $130,000. This sum averaged over 12 years would give plaintiff about $10,833 annually. I cannot disagree with the amount of the remittitur and giving plaintiff the option of making a remittitur is better than an unconditional reversal and remandment.