Alfred Wolfe, Appellee, v. Railway Express Agency, Inc., Appellant.

Gen. No. 43,238.

520

Heard in the third division of this court for the first district at the October term, 1944.

Opinion filed June 29, 1945. Rehearing denied September 6, 1945. Released for publication September 18, 1945.

POPE & BALLARD and WALTER M. NOLD, all of Chicago, for appellant.

HENRY MITGANG, of Chicago, for appellee; ARTHUR A. WOLFINSOHN, of Chicago, of counsel.

MR. PRESIDING JUSTICE BURKE delivered the opinion of the court.

Alfred Wolfe filed a complaint in the superior court of Cook county to recover damages for injuries sustained as a result of being injured by a truck of the Railway Express Agency, Inc., driven by William Mares, on May 28, 1943, on Roosevelt Road in Chicago. Plaintiff dismissed the driver, William Mares, before the case was submitted to the jury. The complaint was filed while plaintiff was in the hospital and at that time he sought damages in the sum of $15,000. During the trial, over defendant's objection, he was granted leave to amend his complaint by asking damages in the sum of $50,000. The jury returned a verdict for $30,000 and judgment was entered thereon. Motions for judgment notwithstanding the verdict, and in the alternative for a new trial, were overruled. This appeal followed. In his brief plaintiff moves the court to dismiss the appeal on the ground that the certificate to the report of proceedings is defective. His point is that the certificate does not state that the report is a complete report of the proceedings at the trial. Par. 4 of Supreme Court Rule 36 reads:

"A claim that any matter in the trial court record actually before the court on appeal is not properly authenticated may be raised only by motion filed by the appellant or appellee before or at the time of filing his brief. Such motions shall be subject to the pro-

visions of Rule 49, and each motion shall be supported by affidavit showing, not only that the matter complained of is not properly authenticated, but that it is in fact incorrect, and that injury will result to the objecting party because of its inclusion. Unless a motion is made in the manner required by this rule, the record shall be deemed to be correct.''

Rule 49 prescribes the manner in which motions shall be presented in a court of review. As plaintiff has not attempted to comply with these rules, his motion to dismiss the appeal is denied.

On Friday, May 28, 1943, shortly before 11:00 a. m., plaintiff, 47 years of age, was walking west on the sidewalk on the south side of Roosevelt Road near State street in Chicago. Roosevelt Road is an east and west highway and State street is a north and south highway. At the point where they cross, Roosevelt Road is elevated and State street is depressed. Wabash avenue is a north and south street and intersects with Roosevelt Road one block east of State street. Plaintiff worked for the National Carloading Corporation in the vicinity of State street and Roosevelt Road. He loaded and unloaded freight from trailers and box cars. On the day of the mishap he did not work. He took the day off to visit the school attended by his son, having been requested so to do by the school authorities. After that he decided to shop and to procure his pay check. He went to the office of his employer between 10:00 and 10:30 a. m. The timekeeper told him that if he could come back at 11:00 a. m., he might have his check for him, and he said he would return at that time. Plaintiff then walked east to Wabash avenue and Roosevelt Road. Stairways lead from the sidewalks on State street to the sidewalks on Roosevelt Road. Shortly before 11:00 a. m. he was walking west on the south side of Roosevelt Road in the course of his return visit to his employer for his check. When he was about 30 feet east of the

stairway leading from Roosevelt Road to the east sidewalk of State street, he got a momentary flash of a truck approaching on Roosevelt Road from the west, about 30 to 40 feet from him. The truck, partially loaded, belonged to defendant and was being driven by William Mares, its chauffeur. The truck was going between 20 and 30 miles an hour. When the truck was from 30 to 35 feet from him, plaintiff heard an explosion like a tire blowing out, and when the truck was about even with him the ring from the right front wheel assembly hit him, injuring his right knee, breaking one or more ribs and breaking his left tibia. He was taken to St. Luke's Hospital by the police, where Dr. William R. Cubbins, staff surgeon, performed an operation on him that afternoon. He remained in that hospital for 58 days under the care and treatment of Dr. Cubbins and hospital attendants. He left the hospital on July 24, 1943. At that time his leg was encased in a plaster of paris cast. He remained at home for a period of about 29 days without any doctor's or hospital care and with his leg in the cast. He then came under the care and treatment of Dr. Charles Pease.

Defendant asks that since there is no substantial evidence that all injuries and disabilities complained of by plaintiff and claimed to exist at the time of the trial and for which the jury awarded an "overabundant allowance," were produced by the mishap of May 28, 1943, or by any lack of ordinary care on the part of defendant, the judgment should be set aside. Defendant asserts that plaintiff failed to prove that any lack of ordinary care on its part was the producing cause of the injuries and disabilities claimed by plaintiff. It is not disputed that the burden was on plaintiff to prove that the cause of his injuries was the negligent conduct of the defendant. Defendant points out that plaintiff filed his suit for damages in the sum of $15,000 while he was in the hospital and

that after he left the hospital and the care of his treating surgeon, his condition apparently became worse, and that on the day of the trial he was granted leave to increase his claim for damages to $50,000. The fact that plaintiff increased the *ad damnum* from $15,000 to $50,000 was a circumstance which undoubtedly was considered by the jury and the court in returning the verdict and in entering judgment thereon. The application to amend was directed to the sound discretion of the court, and in granting it we cannot say that this discretion was abused.

Defendant points out that the testimony of plaintiff's treating surgeon, Dr. Cubbins, disclosed that plaintiff's left leg improved during the time he remained in the hospital; that the leg was in correct alignment; that it showed signs of a good recovery, considering the nature of the injury; that after he had been in the hospital for 58 days he disregarded his treating surgeon's wishes by leaving the hospital and the surgeon's care without their approval; that after leaving the hospital plaintiff went home and had no medical attention for a period of 29 days, an important and critical period; that he took his case in his own hands for about a month; that presumably he found he was getting steadily worse; that finally another physician, Dr. Charles Pease, who had no connection with Dr. Cubbins, went out to plaintiff's home, examined him and told him to report to his office, when he would take the cast off his leg, take X-ray pictures and see what could be done; that it was plaintiff's duty to have his physicians take his condition as they saw it at the trial and trace his ailments back to the time of the occurrence and determine as nearly as could be to what extent his premature leaving of his treating surgeon's care and his going without the care of any physician for weeks after he left the hospital, aggravated his otherwise improved condition.

Defendant urges that the verdict of $30,000 be reduced 70 per cent, or to the sum of $9,000, taking as a guide the amount of $15,000 claimed while he was under the care of his treating surgeon, and comparing it with the $50,000 claimed at the trial, which would be 3/10ths of $30,000, or $9,000. Defendant suggests that if we believe that justice will be served by the payment of damages in the sum of $9,000, the judgment be affirmed on the filing of a remittitur in the sum of $21,000; otherwise, that the judgment be reversed and the cause remanded for a new trial, with directions on the points raised by defendant. In discussing the subject of damages, defendant complains of the court's refusal to give instruction No. 10, reading as follows:

"The court charges you that if you believe from a preponderance of the evidence that the plaintiff left the hospital or left the care of Dr. Cubbins after the accident in question before he should have left, and that his act in so doing caused him greater injury or disability or pain or suffering or loss of time from work than he would have otherwise sustained, you must not allow any recovery against the defendant arising or resulting from such act in leaving the hospital or the care of Dr. Cubbins before he should have done so."

At the request of the defendant the court gave instruction No. 15, reading:

"The jury are instructed that, with respect to the injuries claimed by the plaintiff in this case, the law requires of him, before he can recover for any injury, that he show, by a preponderance of the evidence, not only that such injury exists, but also that it is the result of the occurrence in question and does not proceed to arise from any other cause. The jury have no right to guess or conjecture that any injury complained of by the plaintiff is the result of the occurrence, but before the plaintiff can recover for such injury, the plaintiff must show by the greater weight of the evi-

dence that it does not proceed or arise from any other cause. The burden is not upon the defendant to show that it does arise from any other cause, and even if the evidence is evenly balanced between the plaintiff and the defendant on that question, you cannot allow the plaintiff for any such injury.''

From hearing and reading all of the instructions, the jury would understand that they would not have any right to award damages for aggravation of the injuries caused by the failure of plaintiff to avail himself of the professional care of Dr. Cubbins and the service of the hospital.

There is evidence that plaintiff was in good health prior to the occurrence; that he worked at loading and unloading box cars and trailers and that he was on his feet all day; that at the time of the trial, about 11 months after the occurrence, he could not walk very good; that his legs pained him; that he was unable to sleep; that there was a difference in size in the knee since the occurrence; that the left leg was smaller than the right; that there was no difference between the two legs before the occurrence; that the legs swell up, which they did not do theretofore; and that there is a restriction of motion in the left leg and that he had noticed no improvement in the leg for about four months. The evidence also showed that before the mishap plaintiff had done hard work practically all of his life. The medical testimony showed that plaintiff had his left leg broken in many places, a severe injury to his right leg, and that as a result, his condition was permanent, and that his condition at the time of the trial was due to the injury he had sustained, being the result of defendant's negligence. Plaintiff left the hospital with the cast on his leg on July 24, 1943 and defendant contends his leaving was without the approval of the hospital or Dr. Cubbins, and that Dr. Cubbins and the hospital gave him permission to leave at his request, although they preferred

to keep him for a while if they could. Dr. Cubbins testified that at the time plaintiff left the hospital the union of the leg was firm, but it was that degree of firmness that it could twist or warp unless he continued to protect it. Dr. Cubbins expected a good recovery in the leg and that it would be perfectly true in every respect. At the time of the trial Dr. Cubbins was asked to examine the X-rays of plaintiff's left leg, and when asked whether at the time of the trial there was greater displacement of the bone in the left leg than when plaintiff left the hospital, he answered: "There is a slight backward displacement of the upper portion of the fragment." When asked whether this displacement would have occurred if plaintiff would have remained in the hospital, plaintiff's counsel objected and the objection was sustained. Dr. Pease estimated 75 per cent loss of function of the leg from an industrial standpoint, while Dr. Cubbins estimated 25 to 30 per cent loss of function of the leg from an industrial standpoint. In answer to the question as to whether plaintiff left the hospital with his permission, Dr. Cubbins answered: "We gave him permission at his request. We preferred to keep him for a while if we could." To the further question: "Did you so advise him that you preferred to keep him?" he said: "I think so, yes."

There is no evidence that plaintiff was told that it might be dangerous for him to leave, or that plaintiff would have any reason to know that he might affect his condition adversely by leaving the hospital when he did. In our opinion the testimony of Dr. Cubbins could not be a basis for a contention that plaintiff left the hospital against the advice of his physician, or that he thereby aggravated his injuries. At the time plaintiff left the hospital he had a plaster cast on his leg, which remained there until Dr. Pease removed it. Upon leaving the hospital he was given crutches so that he could move around. He went home, where he

spent most of his time in bed so that he would not aggravate the injury. Dr. Cubbins testified that a physician who had been treating plaintiff from the time the cast was taken off and examined the leg from time to time would have a better opportunity to judge the permanent disability than he (Dr. Cubbins) would have. He stated that at the time plaintiff left the hospital he could not tell with any degree of certainty what the ultimate result would be in the leg. Dr. Pease, an orthopedic surgeon, testified that the X-ray which he took did not show any evidence of an injury for which plaintiff had received a 10 per cent disability through the action of the Industrial Commission; that the commission often allows more than 10 per cent disability without a fracture. We are of the opinion that from this testimony the jury would have the right to believe that the former injury had entirely cleared up, particularly in view of plaintiff's testimony as to how he constantly used the leg without difficulty. We are satisfied that there was substantial evidence that all the injuries and disabilities complained of by plaintiff and claimed to exist at the time of the trial and for which the jury awarded damages, were produced by the occurrence of May 28, 1943, and that the judgment is supported by the evidence.

Defendant contends that the verdict is excessive. The ring knocked plaintiff down, bending one leg out of shape, cut and lacerated both legs, fractured his bones in from 21 to 26 places, injured the pleura of his lungs, the muscles and ligaments of both legs and the circulatory system of his limbs, leaving him permanently injured. When he was brought into the hospital he was suffering from a compound, comminuted wound of the bones of the left leg. The tibia was fractured in 15 or 20 places. These fractures were so extensive they involved almost two thirds of the entire bone. There was a fracture extending up to the knee joints, which involved the tibial spine. He was

given an anesthetic to cleanse the wounds, to remove the dirt, dead tissues, irrigate and remove the loose fragments of bone. After the cast was put on the leg and the leg elevated in traction, it remained in that position for 5 or 6 weeks. He had a lacerated wound above the knee joint in the ''front side'' of the right thigh, from which the blood ran down the sidewalk at the time of the occurrence, and it was necessary for a bystander to put a tourniquet on to control the hemorrhage of the leg. This gave him a vast amount of pain in the right leg for which he was given sedatives, and heat and light were applied. Ten days after he was injured it was green from the knee to the ankle. He had six fractured ribs. The fractured ribs injured the lining of the chest cavity in which the lung is encased, causing a traumatic pleuritis. He developed a very high temperature while in the hospital, which at times reached $103\frac{1}{2}$ and 104. His insides pained him. He was vomiting and in terrible pain. He was given hypodermics for a week. He then developed chills and was packed with hot water bottles at night. When the cast was removed from the left leg after being on for three months, the leg was stiff and could not be moved and there was a scar adherent to the bone. He had edema of the ankle and infiltration of the soft tissues of both legs. He had a traumatic synovitis in the right knee joint, together with a thickened synovia on the right side.

He received expert medical treatment for 11 months, and at the time of the trial had the following injuries: The left leg is smaller than the right leg, due to atrophy of the muscles; there is a restriction of motion in the left leg in many directions, a tendency to turn the left foot in when walking on the leg because of pain; inability to kneel on the leg; swelling of both legs as a result of walking; constant pain and loss of sleep at night due to pain in the limbs; constant use of a cane to walk with; a dropsy in both legs caused by an im-

pairment of circulation; limitation of motion and function in the left knee joint and ankle joint amounting to 75 per cent loss of the use of that leg. In the other leg there is swelling, interference in circulation causing an accumulation of water-dropsy, as in the left leg, also a traumatic synovitis of the knee joint, a thickened synovia that covers the joint which has been damaged and which snaps upon manipulation. The recitation of the injuries suffered by plaintiff and the permanent character of these injuries is sufficient to show that the verdict of $30,000 is not excessive.

 Defendant urges that the injuries were separable, namely, (a) those occurring some years before the accident; (b) those occurring at the time of the accident; and (c) those occurring more than a month after the accident upon plaintiff's disregarding his treating surgeon's services and the hospital's preference and leaving both prematurely; and that the court erred in giving instruction No. 1, reading:

"The court instructs the jury that if you find for the plaintiff, you will be required to determine the amount of his damages. In determining the amount of damages that the plaintiff is entitled to recover in this case, the jury have a right to, and they should, take into consideration all the facts and circumstances as proved by the evidence before them; the nature and extent of the plaintiff's physical injuries, if any, so far as the same are shown by the evidence; his suffering in body, if any, resulting from such physical injuries, as the jury may believe from the evidence before them in this case, he has sustained by reason of such injuries; his loss of time and inability to work, if any, on account of such injuries; all moneys he necessarily expended or became liable for, for doctor bills, if any, while being treated for such injuries; and may find for him such sum as in the judgment of the jury, under the evidence and instructions of the court in this case, will be a fair compensation for the injuries

he has sustained or will sustain, if any, so far as such damages or injuries, if any, are claimed and alleged in the complaint.''

Defendant asserts that in order to follow the first part of this instruction without resorting to conjecture, the jury would necessarily have to have more evidence and knowledge of the separate portions or percentages of disability involved; that the aggregate of disabilities resulting from three separate causes were estimated at 75 per cent and 25 to 35 per cent, respectively, by plaintiff's two treating doctors; that the percentage of disability from the first occurrence was apparently adjudged 10 per cent permanent disability to plaintiff's left leg; that the same leg was involved in the second occurrence, but the percentage of disability was not shown; that the percentage of disability from the third cause was not shown; that the jury could not determine the portion of plaintiff's disability chargeable to defendant; that they could not determine the damages allowable from the evidence; that plaintiff produced no proof that he was permanently and totally disabled; that plaintiff produced no proof that he would not earn money beginning in a few months or a few weeks after the trial; that he produced no proof that all of his injuries, from all causes, had prevented him from securing gainful employment as late as the date of the trial; that he produced no proof that the major portion of his disability was caused otherwise than by his own conduct; and that he produced no proof that that portion of his injuries resulting directly, necessarily and with reasonable certainty from the ring flying off the wheel would not have been largely healed by this time.

Further criticising the instruction, defendant states that the court told the jury that in determining the amount of the damages plaintiff was entitled to recover they should take into consideration the nature and ex-

tent of his injuries so far as the same are shown by
the evidence; that all three sets of injuries were shown
by the evidence; and that the instruction should have
required the jury in determining the damages to take
into consideration the evidence only as to damages for
which the law allows recovery. A further criticism of
this instruction voiced by defendant is that the court
told the jury they might find for plaintiff such sum as
in their judgment, under the evidence and instructions
of the court, will be a fair compensation for the in-
juries plaintiff has sustained, or will sustain, so far
as such damages or injuries are claimed or alleged in
the complaint; that all of his injuries were claimed in
the complaint; that what was alleged in the complaint
the jury did not know; that they did not see it; that it
was not read to them; and that, in fact, the amended
complaint was not filed until after the jury had re-
turned their verdict. Defendant also suggests that
had the theory covered in refused instruction No. 10,
hereinbefore discussed, been given, some of the prej-
udicial results might have been avoided.

The instruction complained of was approved by the
Supreme Court in *Donk Bros. Coal & Coke Co. v. Thil,*
228 Ill. 233. Therein the Supreme Court cites five
cases in which the same instruction was approved.
In its brief defendant states that over its objection
the court granted leave to raise the *ad damnum* and
"told the jury he was allowing the plaintiff to ask
for $50,000 instead of $15,000." The jury knew that
plaintiff was asking for $50,000. Defendant, in one
of its instructions, makes reference to the complaint.
In the case of *Lotspiech v. Continental Illinois Nat.
Bank & Trust Co.,* 316 Ill. App. 482, we reviewed
the authorities in this state on the subject, and con-
cluded that the better practice would be to define the
issues to the jury without referring them to the plead-
ings. However, if the issues are defined, the fact that
the jury is told of the allegations in the pleadings is

not harmful. As hereinbefore pointed out, the court gave, at defendant's request, instruction No. 15, which told the jury the rules of law which it was their duty to apply to the facts as they found them from the evidence before them. We agree with plaintiff that he produced conclusive proof that he was permanently disabled; that he would be unable to return to any employment similar to that which he had done prior to the mishap, because of the injuries to both of his legs and knees; that he had always been employed in occupations that required him to do hard work in order to make a living for himself and his wife and children; that at the time of the trial he was still unemployed because of the crippling effects of his injuries; that there was no proof that plaintiff caused any portion of his injuries by his own conduct; and that there was conclusive proof that all of his injuries were caused directly as a result of the ring coming off of the truck of defendant and striking him.

Defendant maintains that there was substantial evidence supporting its theory that the wheel assembly work complained of by plaintiff was done by an independent third party, rather than by a servant of defendant, and that the instruction on this theory, tendered by it, should have been submitted to the jury. The requested instruction, No. 2, reads:

"The court instructs the jury that if they believe the defendant was operating the truck at the time and place in question in a lawful manner, and the accident in question would not have occurred, except for the negligent act of a third person, then the jury should find the defendant not guilty, even though the plaintiff himself was not guilty of any negligence. The mere happening of the accident itself does not in any way necessarily mean that the defendant was guilty, and before the jury can find the defendant guilty they must find that the defendant was negligent, and that such

negligence was the proximate cause of the accident in question.''

It was defendant's theory that it did not put together the wheel assembly last before the occurrence; that the independent contractor, namely, the Commercial Tire & Supply Company, had through its mechanics, over whom defendant had no control, put together the wheel assembly; and that if there was any negligence in putting together the wheel assembly, the act of this third party caused the mishap rather than any act of the defendant. Plaintiff does not dissent from defendant's statement that it was entitled to have the jury instructed on the theory of its case. Plaintiff insists, however, that the jury was instructed on all phases of defendant's case on which there was competent testimony. Mares, the driver of the truck, testified that the tires were inflated at defendant's garage, and that at the time a tire is inflated the ring is visible. Defendant's witness Basara, testified that if there was anything wrong with the ring locking the the tire to the wheel it would be obvious to a man when he put air in the tire; that defendant's garage at which the truck was storaged and serviced, was equipped to fix tires with cold patches, and that there were other men there who could dismount rims and tires, remount them and put them back on the truck. Fred Viol, the garage foreman of defendant, testified that when ''they'' make repairs on tires in ''their'' garage ''they'' put on cold patches; that the tire involved in the occurrence had had ''some attention,'' some work done on it on May 27, 1943, the night before the mishap. Donald Verkler, a policeman, called by plaintiff, testified that he examined the tube shortly after the occurrence at the scene; that he found that the tube was ''rotten rubber''; that the tube had three cold patches on it; that the tire involved was a six ply Gen-

eral balloon tire with the numerals T–111390457 on
it; that while reporting the mishap he made a note of
the three patches and tire number and read the tire
number therefrom while on the witness stand; and
that he could distinguish cold patches from vulcanized
patches, having worked in a garage. Frank Garner,
a garage employee of defendant, testified that he
checked the truck, and that when he checked the tire
and ring, if there was anything wrong with the ring,
or if the ring was not put on right, he could tell that
fact. N. F. Dour, defendant's assistant superinten-
dent of motor vehicles testified that the number of the
tire involved was 11290457; that he was not positive
that the tube in that tire was patched at the Com-
mercial Tire Co.; that if the tire had been taken
off and a cold patch applied to it, he would not have
"that record." To the question: "So that it might
have been taken off since it went out to this Commer-
cial Tire Company and the tube fixed with a cold patch
and you wouldn't know about that?" he answered:
"I wouldn't know about it." He also testified that
there was evidence of a cold patch on the tube intro-
duced as defendant's exhibit 13.

Walter Welden, a stock handler for defendant, testi-
fied that a tire picked up by Commercial Tire Com-
pany was No. T–129045. This was not the number of
the tire involved in the instant case. G. J. Eberhart,
from the Commercial Tire & Supply Company, testi-
fied that his concern had no record of the serial num-
ber of the tire; that the Commercial Tire Company
does not repair tubes by putting cold patches on; that
everything they do is vulcanized, and that if an inner
tube was repaired with a cold patch it would be the
work of someone other than Commercial Tire Com-
pany. E. L. Moran, a graduate engineer of Armour
Institute, with 25 years experience in handling rims
and rings, testified that the rim and ring in evidence
were two different types which were not designed to

be used together; that they did not fit, nor are they properly matched. The proof was that defendant and Commercial Tire & Supply Company kept books and records of the numbers of the tires sent out for repairs, yet neither company had any record nor any other means of showing that the particular tire had been shipped to or serviced by the Commercial Tire & Supply Company. The proof shows that the tube involved had at least three cold patches on it. Mr. Dour, defendant's superintendent, testified that he was not positive that the tube in the tire was patched at the Commercial Tire & Supply Company, and that there was evidence of cold patches on the tube introduced as an exhibit by defendant. We find that there was no proof that the Commercial Tire & Supply Company put together the wheel assembly last before the mishap. We are of the opinion that the court was right in refusing to give defendant's requested instruction No. 2.

Defendant asserts that the court intensified the confusion of the jury by instructing as follows in given instruction No. 17, offered by plaintiff:

"The court instructs you that when a tort or wrong is committed by an agent or employee in the course of his employment, and while pursuing his employer's business, the employer will be liable for any damage resulting from such tort or wrongful act, although it is done without the employer's knowledge or consent, unless the wrongful act is a wilful departure from such employment or business."

Defendant argues that this instruction encouraged the jury to infer that if Commercial Tire & Supply Company was employed as an agent and defendant was its employer, that the defendant would be liable for any error or negligent act of the Commercial Tire & Supply Company, although it was an independent contractor and although the allegedly negligent act was done

without defendant's knowledge or consent, "unless the wrongful act is a wilful departure from such employment or business." Defendant argues further that it was error to instruct the jury that when a "tort" or "wrong" is committed by an agent, the employer will be liable and that this permitted them to infer that the Commercial Tire & Supply Company was the agent of defendant, that the instruction also left to the jury the law question for their interpretation of what is a tort and what is a legal wrong. We have held that there was no evidence that the wheel assembly last before the occurrence was made by a third party. We do not approve the instruction, but find that the giving of it under the facts of this case was not reversible error.

Defendant urges that under the peculiar facts and circumstances of the case the court erred in refusing to read its requested instruction No. 8, reading:

"If from the evidence in this case, you are unable to say, under your oaths as jurors, what caused the blowout of the tire and the ring to leave the wheel of defendant's truck, then the court instructs you to find the defendant not guilty."

Defendant states that plaintiff failed to make any proof that any act or omission of any act of the defendant directly and proximately caused the injuries, disabilities and damages which plaintiff claimed he was suffering at the time of the trial, and to avoid a case of rank speculation by the jurors, they should have been instructed as requested. Defendant insists that the giving of this instruction was particularly important because plaintiff's expert, Moran, told the jury that the ring was not designed for the rim, but did not tell them that that fact, if it was a fact, caused the mishap; that the most he said was that in his opinion certain things might or could have caused the mishap; and that the jury should have been instructed specifically that if from the evidence they were unable to

say, under their oaths as jurors, what caused the occurrence, then they should find the defendant not guilty. At the request of defendant the court instructed the jury as follows:

"If you believe from the evidence in this case that the injury to the plaintiff was the result of an accident without fault on the part of the defendant, then the court instructs you that the defendant would not be liable and you should find the defendant not guilty."

It is undisputed that plaintiff was injured by the ring which came from the wheel of defendant's truck. Plaintiff was in the exercise of ordinary care for his own safety. The tire was new, but the tube was old and patched. If defendant's employees took all of the precautions in accordance with their testimony, the ring would not have separated from the wheel. There was no evidence that the assembly of the wheel was done by the third party. In our opinion the court was right in refusing to give the instruction.

 Finally, defendant contends that since the affirmative defense that the case was governed by the Workmen's Compensation Act and cognizable only by the Industrial Commission, remained undenied until after plaintiff rested his case, and there was evidence supporting this theory, the judgment should be set aside. Under the liberal provisions of sec. 46 of the Civil Practice Act [Ill. Rev. Stat. ch. 110, par. 170; Jones Ill. Stats. Ann. 104.046], a pleading may be amended at any time before or after judgment, to conform the pleadings to the proofs, upon such terms as to costs and continuance as may be just. The record in this case does not show an abuse of discretion in allowing plaintiff to file a reply denying the allegations of the answer that plaintiff at the time of the occurrence was governed by the Workmen's Compensation Act and that his injuries arose out of and in the course of his employment. Defendant states that at the time of the occurrence plaintiff was in the employ of the

National Carloading Company; that he was reporting for his check, rather than making his employer seek him out and pay him; that he was to return a half hour later for his check, pursuant to the direction of the timekeeper; and that he was returning for his check when the mishap occurred. The Workmen's Compensation Act requires that an accidental injury to be compensable must arise out of and in the course of the employment. We are satisfied that the trial judge, in deciding as a matter of law, that the injuries suffered by plaintiff did not arise out of and in the course of plaintiff's employment, ruled correctly. Because of the views expressed, the judgment of the superior court of Cook county is affirmed.

*Judgment affirmed.*

KILEY, J., concurs.

LEWE, J., took no part.